Filed 1/12/26  In re Kieran S. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re KIERAN S., a Person Coming Under the Juvenile Court Law. | B345697<br><br>(Los Angeles County Super. Ct. No. 19LJJP00321A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AMBER C.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jennifer W. Baronoff, Juvenile Court Referee.  Affirmed.

Jonathan Grossman, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Amber C. appeals from the juvenile court's orders under Welfare and Institutions Code section 388[1] denying her request for additional reunification services and under section 366.26 terminating her parental rights to her son Kieran S. Amber argues the court erred in ruling the parental-benefit exception to adoption under section 366.26, subdivision (c)(1)(B)(i), did not apply. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Juvenile Court Sustains a Petition Under Section 300, and We Affirm (Twice)*

Kieran's parents are Amber and Victor S. (not a party to this appeal). In April 2019, when Kieran was two months old, the Los Angeles County Department of Children and Family Services received a referral stating Amber and Victor used drugs

_____

[1]    Statutory references are to the Welfare and Institutions Code.

in Kieran's presence.  Amber tested positive for amphetamine, methamphetamine, opiates, and morphine, but she denied using methamphetamine.  She claimed that her positive test results were falsified and that she did not use any drugs while caring for Kieran.  Amber did not cooperate with the Department; instead, she absconded with Kieran.  The Department filed a petition alleging Amber's substance abuse posed a substantial risk of serious physical harm to Kieran.  (*In re Kieran S.* (June 14, 2023, B318672) (*Kieran S. I*).)

For nearly two years, Amber was incommunicado and could not be found.  In October 2021 a detective found Amber and Kieran in Shasta County.  Amber admitted to the detective that she had recently used methamphetamine.  Amber's home in Shasta County was clean, and Kieran appeared well, but law enforcement found a methamphetamine pipe in a detached room of the house.  After the Department detained Kieran and transported him to Los Angeles County, the Department placed him with a resource family.  Amber returned to Los Angeles County, and in December 2021 the Department filed an amended petition in Los Angeles County alleging, among other things, Amber's conduct in absconding with Kieran exposed him to risk of harm.  (*Kieran S. I, supra*, B318672.)

In January 2022 the juvenile court sustained counts under section 300, subdivision (b), alleging Amber abused substances, failed to protect Kieran from Victor's mental and emotional issues, and absconded with Kieran.  In February 2022 the juvenile court declared Kieran a dependent child of the court, removed him from Amber and Victor, required Amber to attend a drug treatment program, and ordered reunification services.  (*Kieran S. I, supra*, B318671.)

3

Amber appealed from the jurisdiction findings and disposition orders, and we affirmed. The Supreme Court granted Amber's petition for review and transferred the case to us with directions to vacate our decision and reconsider Amber's appeal in light of *In re N.R.* (2023) 15 Cal.5th 520. In April 2024 we (again) affirmed, concluding substantial evidence supported the juvenile court's findings that Amber abused drugs and that her drug abuse created a substantial risk of serious physical harm to Kieran. (*In re Kieran S.* (Apr. 18, 2024, B318672) (*Kieran II*).)

B.  *Meanwhile, the Department Moves Kieran to Shasta County To Facilitate Reunification with Amber*

While Amber's appeal proceeded, so did family reunification efforts. At the disposition hearing in February 2022 the court granted the Department's request to transfer the matter to Shasta County Superior Court to facilitate Kieran's reunification with Amber (who at some point had returned to Shasta County). In June 2022 the Shasta County Health and Human Services Agency/Children's Services (Children's Services) placed Kieran with a resource family in Shasta County. Amber began having weekly, one-hour, in-person, monitored visits with Kieran at a local family center.

In September 2022 Children's Services reported Kieran was adjusting well to his new placement, but was performing below grade level in preschool. The school provided Kieran with speech services because his verbal skills were delayed and referred him for an autism spectrum disorder assessment. Children's Services reported Kieran had "difficulty with not having things his way, is disturbed by schedule changes, does not have much expressive language, and will tantrum as a result of these things, among

4

others.  He has sensory issues as well."  Regarding visitation, though the juvenile court authorized supervised visitation three times a week for three hours, Amber visited Kieran only once a week for one hour between July and September 2022.  The visits went well.

Children's Services also reported Amber was not in compliance with her case plan.  In particular, Amber "remained untruthful about her methamphetamine use, stating that she has been clean and sober for the last 5 years from opiates and 'does not do methamphetamine' despite multiple reports of her use even since the beginning of the case."  And methamphetamine continued "to be a problem for [Amber], even three years later, in which she was positive for methamphetamine on 07/12/2022."  Amber had also not complied with other aspects of her case plan, such as enrolling in parent education classes and completing a drug and alcohol assessment.  Children's Services recommended the juvenile court terminate Amber's reunification services and set the matter for a selection and implementation hearing under section 366.26.

In December 2022 Children's Services reported Amber was in partial compliance with her case plan.  The report stated Amber was "not demonstrating behavior change," had "not consistently engaged in NA/AA meetings," and continued "to engage in drug-related behavior."  She also "continued to be dishonest with the Agency and show[ed] a lack of accountability for her actions leading up to Kieran's removal."  Children's Services also received copies of text messages suggesting Amber was illegally purchasing prescription drugs.  Amber tested negative for drugs during the period of supervision, but was not

attending NA/AA meetings regularly and had only recently started outpatient drug treatment.

Children's Services also reported Kieran was struggling. After moving to Shasta County Kieran "struggled with behaviors of self-harm and daily tantrums when first placed in the home. Kieran struggled particularly at bed time. He would scream for hours in bed until finally falling asleep, only to wake up every 30 minutes throughout the night screaming." The resource family worked with Kieran to create a comforting routine, and the behaviors improved. But the behaviors recurred after Kieran visited Amber in her home on November 5, 2022 and November 6, 2022. Kieran punched four children in the face at school on November 9, 2022; returned to screaming and self-harming behavior, including hitting himself in the head and slamming his head into walls; and said that he was scared of the bath and of the dark and that "monsters were around." Children's Services also reported that Kieran did not have an intellectual disability or autism, but that he did have adaptive delays in two areas of major life activity and therefore qualified for services at the local regional center.

In a late-December 2022 addendum report Children's Services stated Amber recently participated in a mental health assessment, began therapy, and started taking medication, all of which "significantly improved her moods and behavior." Children's Services, however, still recommended the court set the matter for a hearing under section 366.26 to terminate Amber's parental rights.

C. *The Juvenile Court Terminates Amber's Reunification Services, and Children's Services Places Kieran with a Potential Adoptive Family*

In January 2023 the Shasta County juvenile court conducted a combined six-, 12-, and 18-month review hearing.[2] The court found Amber was in partial compliance with her case plan and terminated her reunification services. Specifically, the court found that Amber continued "to engage in drug-related behaviors including illegally purchasing controlled substances"; that Amber was "engag[ed] in an unhealthy romantic relationship which she denies to the Agency"; that Amber had "not consistently participated in drug and alcohol treatment, nor has she consistently attended AA/NA meetings"; that Amber "continues to blame [the Department] for her absconding with the child for over 2 years"; and that Amber had "not taken accountability for Kieran's past trauma and how it impacts his current behavior." The court set a selection and implementation hearing under section 366.26 for April 21, 2023 and ordered weekly, one-hour, supervised visitation for Amber.

In February 2023 Children's Services placed Kieran with a potential adoptive parent. At first Kieran exhibited many of the same behaviors he had before: self-harming, tantrums, screaming at bedtime and during the night. Those behaviors improved as the new caregiver worked with him to create a comforting routine. By April 2023 the caregiver stated Kieran had adjusted "very well" to the new placement and had "shown that he feels at

_____

[2]    The record does not include transcripts of any proceedings in Shasta County Superior Court.

7

home in his placement and gets along with all family members in the home."

In April 2023 Children's Services reported Amber had one-hour visits with Kieran once a month. The visits went well. A social worker concluded: "[Amber] engages with Kieran in her visits, but does not appear to have a parent/child relationship with Kieran. Rather, [Amber] relies on the caregivers to provide parenting and support to Kieran and Kieran relies on the caregivers for that as well."

In July 2023 the prospective adoptive parent asked Children's Services to change Kieran's placement due to "some regression in behaviors." Kieran resumed "self-harm, throwing toys at younger children, and screaming. These behaviors seemed to heighten following some changes in the visitation schedule with the mother." Kieran also had behavior issues at school.

> D. *Children's Services Places Kieran with a Paternal Aunt in Los Angeles County, and Amber Does Not Visit Kieran in Person*

In August 2023 Children's Services placed Kieran with a paternal aunt in Los Angeles County, and Victor asked the Shasta County Superior Court to transfer the case to Southern California. Amber remained in Shasta County. The court granted in part and denied in part Amber's request to modify her visitation, allowing one weekly monitored virtual visit and one monthly in-person visit. In September 2023 the Shasta County juvenile court identified adoption as the permanent plan.

In November 2023 Children's Services reported Kieran was "doing extremely well in his current placement" and appeared "to

8

be very well-adjusted and comfortable with his resource family/relative placement.  He is surrounded by family including grandparents who also live in the home.  Resource parent keeps Kieran connected to his paternal family and he has several cousins around his age that visit often."  The paternal aunt told Children's Services that she was "committed to providing permanency for Kieran" and "desires and is willing to adopt him."

The paternal aunt initially facilitated video visits for Amber with Kieran.  But the paternal aunt asked Children's Services to supervise the visits after Amber failed to "keep conversations strictly about Kieran's wellbeing," spoke with him about case issues, and said "'weird stuff'" to the paternal aunt.  Amber also sent her uncle to the paternal aunt's house to ask about Kieran, causing the paternal aunt to call law enforcement and to avoid walking outside with Kieran in the area near her house.

In March 2024 Children's Services reported that Kieran was still doing well in his placement with the paternal aunt, that the paternal aunt still wanted to provide permanency for Kieran, and that her home had been approved for adoption.  Kieran's speech and language skills had improved, and the paternal aunt was working hard to get Kieran a range of supportive services.  Kieran's nighttime behavioral issues had also subsided.  The paternal aunt provided Kieran with stability and support.  "When Kieran has negative behaviors, the [paternal aunt] is able to redirect him by reminding him to love and care for himself and others even when he is upset. . . .  Kieran is thriving on a consistent daily routine.  His adoptive family has not expressed any major concerns regarding his behaviors, and is continuing to provide a loving, nurturing environment."  Regarding visitation,

Children's Services stated that social workers facilitated monthly supervised video visits between Amber and Kieran and that the social workers were "concern[ed] that the mother struggles with keeping the conversations positive and child-focused even after multiple attempts of prompting."

In April 2024 the Shasta County Superior Court granted Victor's request to transfer the dependency case back to Los Angeles County Superior Court, which accepted the transfer in May 2024. At a hearing on May 31, 2024 the juvenile court ordered the Department to initiate an adoptive home study and to prepare a report regarding termination of parental rights. The court set the matter for a selection and implementation hearing under section 366.26 on October 1, 2024. At a July 15, 2024 hearing the court ordered monitored phone and video visits for Amber to continue and authorized monthly in-person visits in Los Angeles County.

In September 2024 the Department updated the court on Kieran's potential adoption. The Department reported the paternal aunt and Kieran had developed a strong mutual attachment. Kieran referred to the paternal aunt as his mother, and she continued "to demonstrate her commitment and motivation to providing permanency to Kieran through adoption." But because the paternal aunt recently moved to a new home, the Department needed to approve the new home before further adoption planning could move forward. Regarding visitation, Amber visited with Kieran via video chat approximately once a month between November 2023 and May 2024. Kieran engaged with Amber for short periods, but had difficulty focusing on the calls and would often walk away after a few minutes. The paternal aunt stated that Kieran "struggles with virtual visits"

10

with Amber and that after a January 2024 virtual visit Kieran hid in his toy box. Amber also contacted Kieran by phone for "a couple of minutes" a few times a week. A Department social worker scheduled an in-person visit with Amber for October 26, 2024, but Amber did not attend the visit.

E. *The Juvenile Court Denies Amber's Request To Reinstate Family Reunification Services and Terminates Her Parental Rights*

The juvenile court continued the selection and implementation hearing several times. In the meantime, in February 2025 Amber filed a petition under section 388 seeking custody of Kieran or reinstatement of reunification services. The Department opposed the petition. The dependency investigator who interviewed Amber reported that Amber married someone in August 2024, that Amber would not provide her new spouse's name or birthdate, and that her spouse was in prison for reasons she would not disclose. Amber also said, when asked about Kieran's behavioral issues, that she had never observed any issues and that she believed Kieran's prior caregivers lied about those behaviors. Regarding visitation, the investigator reported the paternal aunt offered Amber the option of in-person visits with Kieran, but Amber did not visit Kieran in person after August 2023. Amber also scheduled but then cancelled two visits. The investigator reported that the paternal aunt wanted to adopt Kieran and that Kieran seemed happy and comfortable in her care.

The court denied Amber's petition under section 388, and Amber timely appealed. On March 12, 2025 the Department

11

advised the juvenile court that the case was finally "adoption ready."

On April 3, 2025 the juvenile court held a contested selection and implementation hearing under section 366.26. Counsel for Amber asked the court not to terminate Amber's parental rights because Amber had a substantial and beneficial bond with Kieran. Amber testified that she consistently visited with Kieran three times a week by phone and that he looked forward to her visits. Though Amber confirmed she had not visited Kieran in person since he moved back to Los Angeles in August 2023, counsel for Amber argued Amber's "visits have been consistent and as good as can be, considering [Amber] lives over 500 miles away."

The court ruled that Kieran was adoptable in general and by the paternal aunt in particular and that there were no legal impediments to adoption. The court ruled the parental-benefit exception to adoption did not apply because Amber did not visit Kieran regularly and consistently, Kieran's relationship with Amber was not beneficial, and the detriment caused by terminating Amber's parental rights would not outweigh the benefits of adoption. The court terminated Amber's parental rights, and Amber timely appealed. We consolidated the two appeals.

## DISCUSSION

Amber argues the juvenile court erred in finding, at the selection and implementation hearing under section 366.26, the

parental-benefit exception to adoption did not apply.[3] The court, however, did not err. Amber failed to show that she consistently visited Kieran, that she had a beneficial relationship with Kieran, or that any benefit of continuing the parental relationship outweighed the benefit of adoption by the paternal aunt, as required under *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).

A.     *Applicable Law and Standard of Review*

The purpose of a hearing under section 366.26 is "'to select and implement a permanent plan for the child'" after the juvenile court has terminated reunification services. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see *In re Andrew M.* (2024) 102 Cal.App.5th 803, 814.)  If the court determines "the child is likely to be adopted," the court must "terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1).)  "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B), (4)(A).)  One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence (1) "that she had 'regular visitation and contact with the child,' (2) 'that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship,' and

---

[3]     Though Amber appealed from the order denying her petition under section 388, she does not argue the court erred in denying her section 388 petition.

13

(3) 'that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.'" (*In re P.S.* (2024) 107 Cal.App.5th 541, 554; see § 366.26, subd. (c)(1)(B)(i); *Caden C.*, at p. 636; see also *In re M.V.* (2025) 109 Cal.App.5th 486, 508 ["The parent bears the burden to show the statutory exception applies."].)

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632; accord, *In re M.V.*, *supra*, 109 Cal.App.5th at p. 507; see *In re I.R.* (2014) 226 Cal.App.4th 201, 212 ["Regular visitation exists where the parents visit consistently and to the extent permitted by court orders."].)  "Visits and contact 'continue[ ] or develop[ ] a significant, positive, emotional attachment from child to parent.' [Citation.]  Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' [citation] but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here, as throughout, the focus is on the best interests of the child." (*Caden C.*, at p. 632; accord, *In re I.E.* (2023) 91 Cal.App.5th 683, 691.)  "[T]he visitation element is to be understood in light of the overall purpose of the beneficial relationship exception." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1070.)

To satisfy the second element, "parents 'must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits.'" (*In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 816.)  The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's

14

custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; accord, *In re M.V.*, *supra*, 109 Cal.App.5th at p. 508.) In assessing the attachment, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, at p. 632; see *Andrew M.*, at p. 816.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re I.E.*, *supra*, 91 Cal.App.5th at p. 692.) "A '"showing . . . the child would derive *some* benefit from continuing a relationship maintained during periods of visitation"' is not a sufficient ground to depart from the statutory preference for adoption." (*In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 818; see *Caden C.*, at pp. 633-634.)

The juvenile court's ruling a parent has not satisfied his or her burden to establish the parental-benefit exception applies "'may be based on any or all of the [three] component determinations—whether the parent has maintained regular visitation, whether a beneficial parental relationship exists, and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be

15

detrimental to the child."'" (*In re A.G.* (2020) 58 Cal.App.5th 973, 996.)  The "parent must prove *all three* components of the beneficial relationship exception," and a "failure of proof on any one of them is fatal." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10.)

"We review the juvenile court's ruling on the first two elements for substantial evidence." (*In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1068; see *Caden C.*, *supra*, 11 Cal.5th at p. 639; *In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 815.)  "We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*Eli B.*, at p. 1068; see *Caden C.*, at p. 640.) In reviewing factual determinations for substantial evidence, we do not "'reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Caden C.*, at p. 640.)

> B.     *Substantial Evidence Supported the Juvenile Court's Finding Amber Failed To Visit Kieran Consistently*

As discussed, in determining whether the parental-benefit exception to adoption applies, the juvenile court must first determine whether the parent maintained regular visitation and contact with the child.  (§ 366.26, subd. (c)(1)(B)(i).)  Substantial evidence supported the juvenile court's finding Amber did not visit Kieran consistently and to the extent permitted by the court. The court found, and Amber does not dispute, she did not visit Kieran in person after Children's Services placed Kieran with the paternal aunt in Los Angeles—a period of more than 20 months. During that time, the court's visitation order permitted Amber to

16

visit Kieran in person once a month.  And the paternal aunt offered to facilitate in-person visits for Amber and Kieran on weekends or whenever Amber's schedule allowed.  But Amber never visited Kieran in person and instead spoke with him on the phone three times a week for "a couple of minutes," and visited by video chat one hour a month.  Amber scheduled two in-person visits, but she cancelled the day before each visit.

Amber argues she visited Kieran "to the extent it was possible for her to do so after the court permitted the child [to] be placed in Los Angeles County," claiming she "lacked the capability of traveling so far."  It is true that, when Kieran moved to Los Angeles, Amber lived in Shasta County with a family friend and lacked stable employment.  But Amber told a social worker that she had reliable transportation and that she worked for online ordering and food delivery companies.  Could she have driven to Los Angeles at least once to visit Kieran?  Probably.  Moreover, five months before the section 366.26 hearing Amber got a job as a dental assistant and worked only four days a week, Tuesday through Friday.  By that point she should have been able to drive to Los Angeles, and her work schedule allowed her to do so.  But when a social worker interviewed Amber in March 2025 (one month before the selection and implementation hearing) and asked why she had not visited Kieran in Los Angeles, Amber said only that she "would look into" having an in-person visit.  She did not tell the social worker she could not afford to visit Kieran at that time or in the recent past.  And at the selection and implementation hearing, when the court asked whether she visited Kieran in person, Amber did not testify she lacked the means to travel to Los Angeles.

Citing *In re A.L.* (2022) 73 Cal.App.5th 1131, Amber argues "[v]isits exclusively by video can qualify as regular visitation." But that's not what happened in *A.L.* In that case the father consistently had two-hour, in-person visits with his daughter twice a week or four-hour visits once a week throughout 2019 and early 2020. (*Id.* at p. 1141-1142.) In March 2020, "due to the COVID-19 pandemic," the father participated in 15-minute supervised telephone calls on a videoconferencing app with his daughter three times a week, attended all of the scheduled visits, and "was appropriate during the calls." (*Id.* at p. 1142.) By at least December 2020 the father resumed in-person visitation. In determining whether the parental-benefit exception to adoption applied, the juvenile court concluded on the first element that the father had "'been extremely consistent with his visits'" and on the third element that the parental-benefit exception to adoption did not apply. (*Id.* at p. 115.) In affirming both conclusions, however, at no point did the court in *A.L.* suggest video visitation could totally replace in-person visitation between a parent and child for purposes of evaluating the parental-benefit exception.

While the distance between Los Angeles County and Shasta County presented an obstacle to in-person visitation, the evidence did not suggest the obstacle was insurmountable. And though a video chat may be a valuable tool for a parent to maintain contact with a child, especially during extenuating circumstances such as the COVID-19 pandemic, in this case monthly video chats and frequent but brief telephone calls could not fully replace in-person visitation, particularly considering Kieran's age and special needs.

18

C.   *Substantial Evidence Supported the Juvenile Court's Finding Amber Failed To Establish a Parental Bond with Kieran*

Even if Amber satisfied the first element of the *Caden C.* analysis regarding visitation, substantial evidence supported the juvenile court's finding Amber did not have a substantial, positive, emotional bond with Kieran. According to the Department Kieran turned to the paternal aunt for affection, support, and assistance, and referred to her as his mother. For example, when a dependency investigator interviewed Kieran and the paternal aunt, Kieran seemed uncomfortable and did not engage with the investigator. He sat on the paternal aunt's lap, and when she left the room, he followed her. The investigator stated, "The child appeared comfortable walking around the home freely and appeared to have a bond with the [paternal aunt] as he would hug her, follow her around, and when he hit his mouth on accident with a cell phone, he hugged her for comfort." Both Children's Services and the Department reported Amber behaved appropriately during visits with Kieran, but observed their bond seemed more playful than parental. (See *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 318 ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with [his or] her natural parent"].) And there was no evidence Kieran experienced distress when visits with Amber ended. Indeed, the telephone calls and video visits often ended because Kieran lost interest or became distracted. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 556 [evidence the children did not cry or experience distress at the end of visits supported the

19

juvenile court's finding the mother lacked a significant, positive relationship with the children].)

Amber argues Kieran benefited from the contact he had with her. She cites her testimony Kieran looked forward to virtual visits and was happy to see her, and she cites the Department's reports stating Kieran called Amber "tummy mommy" and said he loved and missed her. We do not determine, however, whether Amber presented sufficient evidence Kieran had a strong, positive emotional attachment to her, but whether substantial evidence supported the juvenile court's finding he did not. (See *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1195 ["[w]e do not inquire whether substantial evidence would have supported a different order"; we "ask only whether the juvenile court abused its discretion with respect to the order it made"]; *In re Eli B., supra*, 73 Cal.App.5th at p. 1072 ["We must uphold the juvenile court's factual determination as long as it is supported by substantial evidence '"even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."'"].) Substantial evidence supported the court's finding.

> D.  *The Juvenile Court Did Not Abuse Its Discretion in Concluding the Benefits of Adoption Outweighed Any Potential Benefit from Continuing the Parental Relationship*

Finally, even if Amber satisfied the first two elements of the *Caden C.* analysis, she has not shown the juvenile court abused its discretion in concluding the physical and emotional benefits Kieran would receive through the permanency and stability of adoption outweighed any benefit to Kieran from

continuing his relationship with Amber.  As discussed, there was no evidence ending Amber's relationship with Kieran would harm him.  (See *In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 819 [evidence a child "shared an affectionate connection" with his parents during visits and was sometimes reluctant to end the visits did not show there would be a detrimental effect from terminating parental rights, where there was "no evidence that [the child] ever showed distress or was upset when separating from them"]; *In re I.E.*, *supra*, 91 Cal.App.5th at p. 692 [evidence a child "experienced no distress at the end of visits" supported the juvenile court's finding "the relationship was not so substantial that its severance would be detrimental to the child"].)  To justify withholding the "security," "stability," and "'sense of belonging a new family would confer'" (*Caden C.*, *supra*, 11 Cal.5th at p. 633), a parent "must prove more than "'*some* benefit.'"" (*Andrew M.*, at p. 820; see *In re G.H.* (2022) 84 Cal.App.5th 15, 25.)  At a minimum, Amber had to show some type of harm beyond the fact that enjoyable visits ended, and she did not make that showing. (*Andrew M.*, at p. 820.)

There was also ample evidence Kieran would benefit from adoption by the paternal aunt.  Kieran was emotionally bonded with the paternal aunt, enjoyed living with her and the extended family, and relied on her for emotional support and stability.  The paternal aunt established a comforting routine for Kieran and advocated for services to address his educational and emotional needs, and Kieran's behavioral difficulties decreased in her care. This evidence supported the juvenile court's finding terminating Amber's parental rights would not be so detrimental to Kieran that it would outweigh the stability and security adoption would provide.  (See *In re I.E.*, *supra*, 91 Cal.App.5th at p. 693 [evidence

21

the child was well adjusted in her placement, had a mutual attachment to her foster mother, and wanted to live with her prospective adoptive mother supported the juvenile court's finding terminating parental rights would not harm the child]; see also *In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 818 ["It is only '[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, [that] termination would be "detrimental to the child due to" the child's beneficial relationship with a parent.'"].)

## DISPOSITION

The orders are affirmed.


SEGAL, J.


We concur:


MARTINEZ, P. J.


FEUER, J.

22